BLACKSHEAR MANUFACTURING COMPANY *v.*
TALMADGE, commissioner, etc.

704

*S. F. Memory,* for plaintiff.

*W. S. Mann* and *J. K. Whaley,* for defendant.

Gilbert, J.   Blackshear Manufacturing Company filed its petition against Talmadge, Commissioner of Agriculture, seeking injunction to restrain him from "returning" to it and from "cancelling" registrations of forty-four brands of fertilizer and fertilizer materials "filed" by it with the commissioner on December 27, 1930, for the year 1931.   Since 1893 the company has engaged in manufacturing and selling fertilizer and fertilizer materials. The capital invested in plant and equipment amounts to more than $300,000, and its annual output of at least 25,000 tons is worth approximately three quarters of a million dollars.   It contends that statutes bearing upon the handling and inspection of fertilizer and fertilizer materials do not authorize the commissioner to "return" or "cancel" its registrations, and attacks portions of the statutes as being in violation of designated provisions of the State and Federal constitutions.   At interlocutory hearing demurrers filed by the commissioner were sustained, and the petition was dismissed.   The exception is to that judgment.

Petitioner alleges that it is the admitted purpose and intention of the commissioner to return and cancel the registrations, unless he be prevented by the courts from so doing.   Section 1 of the act approved August 24, 1929 (Ga. Laws 1929, p. 228), which became effective on January 1, 1930, and by its terms is an enlargement of the existing laws regulating the sale, distribution, and inspection of fertilizers, provides that all persons manufacturing, mixing, selling, or offering for sale the commodities mentioned "shall first file annually with the commissioner, upon forms supplied" by him, a registration of each brand manufactured, stating the places at which registrant will do business, the sources from which the various constituent elements of each brand are derived, and pay a fee of five dollars for each brand.   Full compliance with this provision is alleged.   The grounds upon which it is alleged the commissioner claims the right to return and cancel the regis-

trations are: (1) That petitioner is liable for a penalty of twenty-five per cent. of the purchase-price of the entire output of petitioner during 1930 of two named brands of fertilizer valued at $1700, plus shortage in commercial value, because of the contention of the commissioner that samples of these fertilizers failed to meet requirements of the law. (2) That petitioner sold during 1930, without registering the same, a brand of fertilizer of stated guaranteed analysis under the name "Brantley's Tobacco Special." (3) That petitioner did not submit for analysis samples of brands proposed for registration in 1931, which the petition alleges the commissioner contends was required by the Civil Code (1910), § 2068. It is alleged that petitioner did not during 1930 sell any fertilizer under the brand "Brantley's Tobacco Special" of the guaranteed analysis stated.

The question is whether the petition set out a cause of action as against the general demurrer. Under the law a manufacturer of fertilizer must register in the department of agriculture the brands of his product, before they can be lawfully sold. The petitioner company alleges that it complied with the law, including the payment of required fees and the signing of an application on a form provided by the Commissioner of Agriculture, and that its brands of fertilizers were registered in accordance with the law. It further alleges that the commissioner admittedly "purposes and intends" to cancel its registrations and to return the same to petitioner. These alleged facts are of course admitted by the commissioner for the purposes of this case, at this stage. Section 11 of the act of 1929 (Ga. Laws 1929, pp. 228-232) is as follows: "If any manufacturer or mixer shall be subject to a penalty under the terms of this law and shall fail or refuse to pay the same upon demand as provided in the preceding section, the Commissioner of Agriculture is authorized to cancel the registration or registrations of such manufacturer or mixer and to forbid the sale by such manufacturer or mixer of any fertilizer or fertilizer materials in this State until such penalty or penalties have been paid, or final judgment has been obtained." The only penalties which can be lawfully assessed are those provided in section 9 of this act, where it is provided that "these penalties shall be in lieu of all other penalties now provided by law, and shall not be cumulative."

Did the General Assembly intend, in this section, to authorize

the Commissioner of Agriculture, arbitrarily and without a hearing, to cancel the registration or registrations of the manufacturer? We have no difficulty in arriving at the conclusion that if the section is so construed it will be in conflict with the due-process clauses of the State and Federal constitutions. That question, in principle at least, was settled in *Southern Cotton Oil Co.* v. *Raines,* 171 *Ga.* 154 (4 *b*) (155 S. E. 484). We do not, however, think that it is necessary to so construe the section. It is well settled in this State that where a statute is susceptible of two constructions, one being in conflict with the constitution and the other not, it is our duty to give it the construction which will be constitutional. The section begins with the language, "If any manufacturer· or mixer shall be subject to a penalty under the terms of this law and shall fail or refuse to pay the same upon demand as provided in the *preceding section,*" the commissioner is authorized to cancel the registration, etc. Clearly, according to that language, a manufacturer or mixer is subject to a penalty under the terms of law only when such penalty has been established in accordance with the preceding or section 10 of the same act. Section 10 provides: "Whenever any fertilizer or fertilizer material upon analysis by the State Chemist is found subject to a penalty under the provisions of this law, the Commissioner of Agriculture is empowered and it is hereby made mandatory upon him to proceed by attachment or other legal means to collect such penalty from the party or parties subject thereto and to pay the same to the person or persons entitled to receive it. Provided, that such adjustment is not made after sixty days from notice of deficiency from Commissioner of Agriculture." This merely means that where the State Chemist has made an analysis and found the manufacturer subject to penalty, which incidentally is only a prima facie holding and not final, the Commissioner of Agriculture must serve notice on the manufacturer of the findings of the State Chemist, and sixty days from such notice must elapse before the commissioner can take any further action. If after the sixty days from the notice of deficiency the manufacturer has not paid the amount of the penalty, the commissioner shall then proceed by attachment or other legal means to collect the same.

The necessary legal effect of this procedure, as we have construed it, is that the manufacturer will have the opportunity, after

service, to come into court and be heard in the judicial proceeding. If after trial according to the law of the land the issue is finally adjudicated adversely to the manufacturer, the penalty has then been established according to law. In this event the Commissioner of Agriculture, in pursuance of his duty under section 11 of the same act, is authorized to cancel the registration or registrations of such manufacturer or mixer and to forbid the sale by such manufacturer or mixer of any fertilizer or fertilizer materials in terms of section 11. It is apparent that this act is loosely drawn, an instance of which is found in the concluding words of section 11, where the commissioner may cancel the registration until the penalties have been paid or final judgment obtained. It would seem from the literal words of the section that the commissioner could waive the actual payment of the penalty after final adjudication and consider the cancellation as ended when final judgment has been obtained, but that question is not now for decision. The proceeding by attachment or other legal means to collect the penalty, however, is not the only procedure authorized under section 10. There is another proviso, as follows: "Provided further, that the matter is not being contested in the court or courts, in which event the powers of the commissioner shall be suspended until final determination of the matter by the courts." This means that if the liability for the penalty is already being contested in court, for instance by the purchaser, then the commissioner shall refrain from proceeding by attachment or other legal means to collect the penalty. The construction placed upon sections 10 and 11 renders it unnecessary to pass upon their constitutionality. Our attention is also directed to section 9 of the same act, which provides penalties for a shortage in plant food or commercial value. This section is: "Any fertilizer or fertilizer material sold in this State without compliance with the requirements of the law, any fertilizer which upon analysis by the State Chemist shows a shortage in any one plant food of ten per cent. or more, and any fertilizer which upon analysis under direction of the State Chemist shows a shortage in commercial value below the guarantee of five per cent. or more shall be subject to a penalty of twenty-five per cent. of the purchase-price, plus the actual shortage in commercial value. These penalties shall be in lieu of all other penalties now provided by law, and shall not be cumulative." It is contended that this section

also is in conflict with the due-process clauses of the State and Federal constitutions. For the same reasons we decline to pass upon the constitutionality of this section, because a proper construction renders it unnecessary. Construing this section in connection with the whole act, we construe the language "shall be *subject* to a penalty of twenty-five per cent., . . plus the actual shortage in commercial value," to mean merely a prima facie finding subject to final adjudication, and not in itself final. To hold otherwise would render it necessary to declare this section unconstitutional for the same reasons as those stated with reference to sections 10 and 11. There is no contention that the penalty claimed against Blackshear Manufacturing Company has been established by final adjudication as indicated above; and for that reason the petition set out a cause of action. The provision for assessing a penalty must be construed strictly.

The construction which we have placed upon sections 9, 10, and 11 of the act of 1929 is in accord with the contention of the defendant in error, as shown by the following excerpt from his brief : "The word 'subject' used in this act is evidently used in a qualified and not in an absolute sense. It is used in the sense of being liable or exposed to penalty, but not absolutely penalized. The word seems to be used in the sense that it was used in the constitution of the State of Mississippi in a provision 'subject to taxation,' in which it was held that the clause meant liable to taxation, and could not be construed as meaning that the property must be subjected to taxation." The petitioner alleges that the penalty sought to be imposed by the commissioner is illegal and unauthorized, because the samples analyzed were not taken as provided by law. The question of how these samples should be taken was thoroughly considered in a comparatively recent case. For that reason we deem it unnecessary to discuss that question here. We merely refer to *Swift* v. *Duncan*, 154 *Ga.* 487, 490 (114 S. E. 897), where, among other things, it was said: "The sample which the State Chemist analyzes is not each separate subsample which the inspector lodges with the Commissioner of Agriculture, but 'a sample of all fertilizers or fertilizer material drawn by the official inspectors and filed' with the commissioner. It is a composite sample. The State Chemist makes a complete analysis of this composite sample, which is recorded as the official analysis, and

entered opposite the brand of fertilizers or fertilizer material which the sample represents. This is the official analysis referred to in the Civil Code, §§ 1773, 1783. The inspection laws do not require each subsample of each lot of fertilizer material inspected to be separately analyzed and its separate analysis kept; but it requires only one analysis of the State Chemist, and that is a sample of all the subsamples drawn by the inspectors from lots of the same brand. This sample is made up of all the samples drawn and filed by the inspectors. The analysis of this sample is the official sample [analysis]. If the law required each inspector's subsamples analyzed, and its analysis placed opposite the lot inspected, then this analysis would be the one referred to in the above sections; but as the law does not require an analysis of each subsample of each lot drawn and filed by each inspector, and only requires one analysis of such composite sample, which is made the official analysis, the latter applies to each sale of any given brand."

The brief of the defendant calls attention to the following, which is found in the form furnished by the commissioner, signed by Blackshear Manufacturing Company, and attached to plaintiff's petition: "In consideration of being allowed to sell and distribute the above-named brands of fertilizers and fertilizer materials, before the official analysis thereof is made, we agree and bind ourselves to cancel all sales thereof, and forfeit all claims for purchase-money thereof, if after the official analysis of any of these brands or materials is made the Commissioner of Agriculture shall prohibit the sale of said brands or materials in accordance with law." It is insisted in effect that by reason of that signed declaration the company agreed to accept the rulings of the commissioner and to abide the results without contest. Without deciding the extent to which this declaration would bind Blackshear Manufacturing Company or whether it contains the elements of a binding contract, it is only necessary to note that the agreement is that the company will perform the agreements mentioned if and after "the commissioner shall prohibit the sale of said brands or materials *in accordance with law.*" It would seem that, without these words "in accordance with law," no contract or agreement would be binding which authorized the commissioner to act without legal authority. The legislature has been careful in framing the fertilizer laws to prohibit fertilizer manufacturers from gaining any unlawful advantage by means of contracts.

Section 11 refers to refusal of the manufacturer to pay the penalty "upon demand as provided in the preceding section." The preceding section (10) does not use the word "demand," but we agree with counsel for the defendant that the words just quoted evidently refer to that part of section 10 as follows: "Provided, that such adjustment is not made after sixty days from notice of deficiency from Commissioner of Agriculture."

The petition, in paragraph 20, including its subparagraphs, contains a lengthy general attack upon the fertilizer laws, particularly as contained in the Civil Code (1910), §§ 1781, 1783, on the ground that the provisions are unreasonable, unjust, arbitrary, and oppressive. The allegations are elaborate in details and in statements of reasons. The plaintiff in its brief requests the court to decide another question. That request has reference to the claim of penalty for the sale of fertilizer branded "Brantley's Tobacco Special." The petition alleges that the company did not sell any of that brand during 1930, the year in question. That allegation must, on demurrer, be accepted as true. It is not necessary to decide that question or to comment upon the criticisms of the fertilizer laws contained in paragraph 20 of the petition. It is deemed wiser to leave all questions not necessary for decision to be met when proper occasions arise.

The court erred in sustaining the general demurrer.

*Judgment reversed. All the Justices concur.*

BECK, P. J., and ATKINSON, J., concur in the result.